# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### April 24, 2008 Session

## AHMAD SULEIMAN d/b/a BARKSDALE MARKET v. CITY OF MEMPHIS ALCOHOL COMMISSION

### Direct Appeal from the Circuit Court for Shelby County
### No. CT-002570-07     Jerry Stokes, Judge

---

### No. W2007-01806-COA-R3-CV  -  Filed July 24, 2008

---

Following a trial *de novo* on writ of certiorari, the trial court reversed the City of Memphis Alcohol Commission's denial of a beer permit, ruling that the evidence did not support a finding that the sale of beer from the applicant's market would interfere with the public health, safety, and morals. It ordered the City of Memphis to issue a beer license to the applicant. We conclude that the evidence preponderates against the trial court's decision. We reverse and remand.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed; and Remanded

DAVID R. FARMER, J., delivered the opinion of the court, in which HOLLY M. KIRBY, J. and WALTER C. KURTZ, SR. J., joined.

Elbert Jefferson, Jr. and Roane Waring, III, Attorneys for the appellant, City of Memphis Alcohol Commission.

Scott L. Kirkpatrick, III, Memphis, Tennessee, for the appellee, Ahmad Suleiman.

### OPINION

Ahmad Suleiman  ("Mr. Suleiman") applied to the City of Memphis Alcohol Commission ("the Commission") for a permit to sell beer at the Barksdale Market, a convenience store in the Cooper-Young neighborhood, for off-premises consumption. The previous owners of the Barksdale Market had sold beer there and, according to Mr. Suleiman, were in good standing with the Commission. On May 2, 2007, the Alcohol Commission denied the application for the license, finding that beer sales would interfere with the public safety, health, and morals. The Alcohol Commission rendered its decision pursuant to section 7-8-11 of the Memphis Code of Ordinances, which states, in pertinent part, as follows:

> A.  No license shall be issued to sell any beverage coming within the provisions of
> this chapter:
> . . . .

3. Where such sale will cause congestion of traffic or interference with schools, churches, or other places of public gathering, or otherwise interfere with public health, safety and morals, and the judgment of the [A]lcohol [C]ommission on such matters shall be final, except as same is subject to review at law.

Memphis Code of Ordinances § 7-8-11 (formerly codified at § 4-71). Mr. Suleiman filed a petition for writ of certiorari in Shelby County Circuit Court on May 17, 2007, seeking review of the denial of his application. The Alcohol Commission filed its response, and a trial *de novo* was held on July 16, 2007.

Mr. Suleiman testified before the Commission and the trial court. At trial, he described the improvements he had made at the market, including painting, repairing the flooring and the lighting, installing security cameras, and upgrading the air conditioning unit. He also asserted that the previous owners of the market sold beer there and that there were three other similar establishments within a four-block radius of the market. The record reflects that although there are other establishments permitted to sell beer in the vicinity, this market appears to be embedded in a residential sector of the neighborhood. There is only one commercial establishment in the immediate area - - a recording studio across the street - - but it is not open to the public. In contrast, as one witness at trial emphasized, at least one (if not all) of the other three beer sale outlets is located in a commercial sector of the neighborhood, with a high concentration of traffic.

Mr. Suleiman presented inconsistent testimony as to the projected percentage of gross sales attributable to beer. Before the Commission, he testified that the sale of beer was vital to his business and estimated beer sales to be approximately 20% to 30% of gross revenue. At trial, however, he approximated that beer sales would account for 50% to 60% of his gross revenue.

Over the course of the Commission and trial court proceedings, five (5) Cooper-Young residents testified on the subject of beer sales at the Barksdale Market. Several witnesses complained about the increased foot traffic from outside the neighborhood, comprised of market customers who would purchase beer, drink it in public, and throw their trash in the yards of the residents. One resident who works out of her home in Cooper-Young testified at trial to her personal experience with this problem and to witnessing it happen to other residents. She also testified that after the beer sales ceased, she noticed a distinct drop in foot traffic and litter.

Another problem cited by the residents was the criminal activity associated with the market and the sale of beer there. Most witnesses testified to recent occurrences of robberies in the market and to the former owner being shot inside the market. Indeed, one witness at trial clearly stated, without objection, to his awareness of this fact. Mr. Suleiman does not dispute this point. This same witness testified that being able to purchase beer at the market would be convenient for him, but that the increased potential for crime posed a problem for the neighborhood. One resident's testimony before the Commission summarizes well the nature of the testimony throughout these proceedings:

I've been a resident in the community and - - right behind the store for approximately four years. And under the previous operators, alcohol was sold at this location. And within the last year, there has been a very troubling series of shootings that have occurred at this location. There have been two shootings with serious injury. I believe the first was in June of 2006, and then there was one in February of this year in which the clerk was robbed at gunpoint and shot. . . .

My street provides, I think probably with the exception of Nelson - - or in addition to Nelson, the most direct access to this establishment from outside of the Cooper-Young neighborhood. And I can personally attest to the fact that the foot traffic from outside the neighborhood is constant, and I believe it to be alcohol related. I see many - - on many, many occasions - - pretty much on any given day and certainly on any given Saturday, I can sit in my living room and observe individuals walking - - that I know do not live on my block, which I think is the last block of Cooper-Young - - walking through my block to this establishment, purchasing alcohol, and then sitting in the front yard of someone on my block to consume it, if not on the premises itself. I have observed that as well.

And so, from a personal perspective, it causes me great concern during the course of the last six weeks when the establishment has not been operating[1] or has not been selling alcohol at this location, there has been a significant decrease in the amount of foot traffic through the neighborhood. . . .

. . . .

I think the point that I'm trying to make is that it has been my personal observation that the vast majority of the trouble that we have had in the neighborhood at this establishment is related to the sale of alcohol at the establishment.

Another resident who testified before the Commission, but not at trial, had conducted a neighborhood survey of well over two hundred residents and presented her findings to the Commission. According to her survey, there was widespread opposition to the prospective issuance of the permit.

At trial, the Commission interposed another issue: Mr. Suleiman's business practices. A Cooper-Young resident testified that he entered the market on May 7, only five days after the Commission had refused to issue the permit, and purchased beer there. He testified that he was aware of potential problems with the permit and so asked the store clerk if beer was still for sale. He bought two six-packs of beer that day. Regarding the transaction on May 7, Mr. Suleiman stated that he knew nothing about it, but that the clerk on duty that day no longer worked for him. Mr.

---

[1]The witness was referring to a six-week period when the store was closed, prior Mr. Suleiman's opening the business.

Suleiman contended that although the cooler still contained beer, he had posted a "Not for Sale" sign there.

In addition to proving an unlawful beer sale on May 7, the Commission highlighted Mr. Suleiman's past violations in connection with another store he owns in Memphis. It also emphasized Mr. Suleiman's dishonesty regarding the matter when questioned by the Commission. When asked during the Commission proceedings if he had any prior violations or previous appearances before the Commission, Mr. Suleiman replied in the negative. At trial, however, it was clear that Mr. Suleiman had been before the Commission at least three times before, each appearance relating to violations for selling beer to minors. The record reveals four previous violations in connection with his other store. To reconcile this obvious conflict, Mr. Suleiman stated that he thought the Commission was inquiring into his personal history rather than his history as a business owner. Nonetheless, he stated that his employees had sold the beer and that he had fired them upon learning of their respective infractions. The most recent violation[2] occurred in 2000 and involved a fine of $1,000; Mr. Suleiman asserted that he had been entrapped on that occasion.

On July 17, 2007, the trial court entered an order reversing the Alcohol Commission's denial and directing the City to issue a beer license to Mr. Suleiman. The order stated that the court had considered the evidence and testimony submitted before it, including the transcript from the proceedings before the Commission, and concluded that the record failed to support the Commission's denial on the basis of interference with the public health, safety, or morals. The trial transcript indicates that the court reached this conclusion, in part, because beer had been sold there in the past, because other businesses within four blocks also sold beer, and because this Court, in *Al-Koshshi v. Memphis Alcohol Commission*, had reversed a permit denial under more egregious circumstances than those at bar.

The Alcohol Commission filed its notice of appeal on August 7, 2007. On appeal, it argues that three factors - - Mr. Suleiman's history of selling beer to minors, dishonesty about that history, and, more recently, illegal beer sales from the Barksdale Market - - overwhelmingly support its denial of Mr. Suleiman's permit application.

### *Issue Presented and Standard of Review*

The Commission raises the following issue on appeal:

Whether the evidence preponderates against the judgment of the trial court reversing the decision of Appellant, City of Memphis Alcohol Commission, denying a license

---

[2]Despite Mr. Suleiman's general insistence that his employees were responsible for these violations, we note that his testimony regarding the most recent violation indicates he participated in the sale:

[L]ike I told you, I had been checking everybody's i.d.'s, and that guy show[ed] me a fake i.d., or somebody else's i.d.

to Appellee, Ahmad Suleiman, and allowing the sale of beer at his convenience store, Barksdale Market, for off-premises consumption.

Tennessee Code Annotated section 57-5-108 provides that the exclusive method of review of an agency's refusal to grant this type of license is by way of the statutory writ of certiorari. Tenn. Code Ann. § 57-5-108(d), (f) (2002). An unsuccessful applicant can petition the circuit or chancery court of the county in which the denial occurred and thereby obtain a trial *de novo* as a substitute for appeal. *See id.* § 57-5-108(d). When the trial court grants the writ, the agency must then certify and transmit to the court the transcript of its proceedings. *Id.* § 57-5-108(e). Although the court reviews that transcript, it also presides over the trial as if the cause had originated in that court. *See Cantrell v. DeKalb County Beer Bd.*, 376 S.W.2d 480, 482 (Tenn. 1964). Further, the trial court must make an independent judgment on the merits and may substitute its judgment for that of the licensing authority. *Id.* In this case, Mr. Suleiman obtained a trial *de novo* and a favorable judgment.

The Commission now appeals the trial court's order directing the issuance of the permit. The sole question presented is whether the issuance of this permit to Mr. Suleiman would interfere with the public health, safety, or morals; if so, such interference would be a ground for denying the permit under section 7-8-11 of the Memphis Code of Ordinances.[3] Further, the Tennessee Code provides that

> (b) In order to receive a permit, an applicant must establish that:
>     (1) No beer will be sold except at places where such sale will not cause congestion of traffic or interference with schools, churches, or other places of public gathering, or otherwise interfere with public health, safety and morals[.]

Tenn. Code Ann. § 57-5-105(b)(1) (2002 & Supp. 2007). The trial court found that the evidence did not support a finding that issuing this permit would cause such interference. In reviewing a trial court's judgment regarding the issuance of a beer permit, this Court presumes it to be correct and can disturb it only when the preponderance of the evidence is otherwise. *Harvey v. Rhea County Beer Bd.*, 563 S.W.2d 790, 792 (Tenn. 1978); *Lones v. Blount County Beer Bd.*, 538 S.W.2d 386, 389 (Tenn. 1976); *Al-Koshshi v. Memphis Alcohol Comm'n*, No. W2004-02783-COA-R3-CV, 2005 WL 1692947, at *3 (Tenn. Ct. App. July 19, 2005)(*no perm. app. filed*). Accordingly, we shall now consider whether the evidence preponderates against the trial court's finding that the issuance of the permit to Mr. Suleiman would not interfere with the public health, safety, and morals.

### *Analysis*

Our analysis begins with *Al-Koshshi v. Memphis Alcohol Commission*, the case noted by the trial court and relied upon by Mr. Suleiman. In *Al-Koshshi v. Memphis Alcohol Commission*, this

---

[3]Tennessee Code Annotated section 57-5-106(a) grants to municipalities the power to pass ordinances that govern the issuance, revocation, and suspension of licenses for, among other things, the sale of beer. Tenn. Code Ann. § 57-5-106(a) (2002).

Court considered whether the trial court properly denied a beer permit for interference with the health, safety, and morals of the community. *Al-Koshshi*, 2005 WL 1692947, at *1. There, the Memphis Alcohol Commission and the trial court had denied the permit based upon the proximity of the business to three schools, a history of loitering, littering, and prostitution in the area, and testimony to the effect that those historical problems had abated when the beer sales ceased. *Id.* at *2.

In *Al-Koshshi*, we concluded that the record lacked evidence linking the cited problems to the sale of beer at that location, as well as the improved surroundings to the cessation of beer sales. *Id.* at *3. The applicant's convenience store was located at an intersection in a high-traffic area. *Id.* at *1. At least two establishments permitted to sell alcohol were located in the immediate area. *Id.* at *3. Even if prostitution in the area had decreased, the record revealed that the prostitutes generally congregated across the street, not in or near the applicant's business. Aside from the Commission's blanket allegations, we could find nothing that even suggested a causal link between the beer permit and prostitution.

Further, we found the store manager's testimony to be particularly relevant on several points. He testified to cleaning the parking lot six to eight times a day; to collecting bags of litter generated by pedestrians and drivers passing by; to working with local police so that patrols would increase to three times per day; and to installing security cameras. *Id.* at *1. He also testified that Citgo Oil Company had just purchased the store and was going to spend $65,000 on improvements. *Id.* Regarding the store's proximity to schools, the manager testified that most of the students frequented the business across the street because it was more accessible to the schools and had not implemented a policy (like his) prohibiting the presence of more than two students in the store at one time. *Id.* In sum, this Court reversed the trial court's denial, noting that the great weight of authority on this point resulted in reversals under similar facts. *Id.* at *4.

A review of these authorities makes clear that the record must contain some factual evidence showing "how or why the particular permit requested would interfere with public health, safety and morals." *Harvey v. Rhea County Beer Bd.*, 563 S.W.2d 790, 792 (Tenn. 1978)(quoting *Ewin v. Richardson*, 399 S.W.2d 318, 320 (Tenn. 1966)). Indeed, general objections to the sale of alcohol provide no support for the denial of an otherwise permissible license to sell beer, nor does the expression of fears, speculations, and apprehensions of those with fixed opinions regarding the subject matter. *Id.*

This case presents community grievances that are particular to the sale of beer at the Barksdale Market. General grievances or fears cannot support a permit denial. *See, e.g.,Harvey*, 563 S.W.2d at 792 (finding no factual evidence regarding how or why the permit would interfere with public health, safety, and morals, and noting that opposition was largely based on the fear that beer would become more readily available to high school students); *Coffman v. Hammer*, 548 S.W.2d 310, 312 (Tenn. 1977)(finding no basis for a denial of beer permit where objections to its issuance consisted of general concerns regarding potential for drinking and driving, for increased litter along the highways, and for the destruction of the social fabric); *Green v. City of Memphis*, Shelby Equity

No. 17, 1990 WL 66527, at *1 (Tenn. Ct. App. May 22, 1990), *perm. app. denied* (Tenn. Sept. 24, 1990)(affirming issuance of permit where record contained no adverse evidence particular to that applicant and where opposition consisted of fears about alcohol-related crimes and problems unrelated to proprietor or establishment). In contrast to the evidence in the leading cases on the subject, this record contains factual evidence showing how this particular permit would adversely affect the welfare of the community.

At trial and before the Commission, Cooper-Young residents testified that customers of the Barksdale Market littered residents' yards with beer cans and bottles. In *Coffman*, the "litter" grievance was a statement to the effect that "discarding beer cans and bottles along the highway is 'detrimental to public health, the environment, and constitutes a public nuisance.'" *Coffman*, 548 S.W.2d at 312. In *Al-Koshshi*, there was widespread litter, but the establishment in that case was located at a busy commercial intersection where other beer outlets were operating. *Al-Koshshi v. Memphis Alcohol Comm'n*, No. W2004-02783-COA-R3-CV, 2005 WL 1692947, at *3 (Tenn. Ct. App. July 19, 2005)(*no perm. app. filed*). Moreover, the connection between the cessation of beer sales there and the decrease in litter was, as we noted, tenuous at best. *Id.* We further opined that "the Tennessee Supreme Court has suggested that litter and trash found along our public roads affords no basis for the denial of a beer permit." *Id.* (citing *Coffman*, 548 S.W.2d at 312, and quoting its statement that "beer drinkers have no monopoly on that unfortunate predilection of some members of the public to mar the beauty of public thoroughfares . . ."). Unlike the opposition in *Coffman* and *Al-Koshshi*, however, the testimony offered by these residents unequivocally linked the sale of beer from this particular establishment to the littering of private property with beer bottles and cans purchased at that market. Although not determinative, this point is still a relevant factor in our analysis of this unique circumstance.

Likewise, Cooper-Young residents raised the issue of crime associated with the Barksdale Market. In *Green*, this Court held that residents' statements regarding previous incidents of crime and alcohol-related problems were immaterial because those occurrences had no connection to the establishment itself or to the proprietor. *Green*, 1990 WL 66527, at *2. In this case, there is no apparent dispute that the shootings and armed robberies occurred inside this market. We cannot leap to the conclusion that the sale of beer at this location attracted the participants in those crimes; nevertheless, we do believe the record contains evidence that the sale of beer at this establishment attracts foot traffic from outside the neighborhood and that an increase in litter and unlawful conduct accompanies that foot traffic.

It is true that these events transpired before Mr. Suleiman became involved in the market's operation. In *Lones v. Blount County Beer Board*, the Tennessee Supreme Court reversed the denial of a beer permit and declined to consider the establishment's prior reputation for lawless acts in connection with its new owner's application for the permit. *Lones v. Blount County Beer Bd.*, 538 S.W.2d 386, 389 (Tenn. 1976). In contrast to armed robbery, for example, the lawless acts in *Lones* involved intoxication and drunken driving. *Id.* Moreover, the court stated that "[i]t should be noted at the very outset that this applicant stands in this record as a . . . citizen of good moral character." *Id.* This record, on the other hand, contains evidence of Mr. Suleiman's history of selling beer to

minors and, more importantly, of the unlawful sale of beer from the Barksdale Market. Mr. Suleiman himself may not have participated in these transactions, but, at least in the most recent sale from this establishment, he did very little to insure compliance with the law. Indeed, after the Commission denied his permit, Mr. Suleiman could have removed the beer from the cooler or placed a lock on it to avoid further problems with the City of Memphis. Additionally, we find Mr. Suleiman's attempt to reconcile his conflicting testimony regarding previous violations to be disingenuous at best. We have little trouble making the connection between a beer vendor's inability to abide by the law and its adverse effect on the community welfare.

We conclude that the residents' testimony concerning the sale of beer from this particular establishment and Mr. Suleiman's business practices, considered together, preponderate against the trial court's decision. This case stands in stark contrast to the *Al-Koshshi* case. In *Al-Koshshi*, there was no basis in the record for connecting prostitution and littering to that establishment, situated as it was on the corner of a busy, commercial intersection. Here, the Barksdale Market is surrounded by homes and a church, and the record contains evidence linking the sale of beer there to a pattern of littering and unlawful conduct. Unlike the manager in *Al-Koshshi*, who took proactive measures to combat litter and crime, Mr. Suleiman has shown himself to be less than forthright in his testimony and, at best, ineffective in complying with the laws concerning the sale of beer. We therefore reverse the trial court's judgment and remand the matter for further proceedings. Costs of this appeal are taxed to the Appellee, Ahmad Suleiman d/b/a Barksdale Market, for which execution shall issue if necessary.

_____
DAVID R. FARMER, JUDGE